**FILED**

AUG 1 1 2022 ᵧₚ

RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 20 CR 232 |
| v. | Judge Ronald A. Guzman |
| ROBERT DIMEO | |

### PLEA AGREEMENT

1.    This Plea Agreement between the United States Attorney for the Northern District of Illinois, JOHN R. LAUSCH, JR., and defendant ROBERT DIMEO, and his attorney, WILLIAM ZIEGELMUELLER, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.    The indictment in this case charges defendant with mail fraud, in violation of Title 18, United States Code, Section 1341 (Counts 1-10).

3.    Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Charge to Which Defendant Is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count One, which charges defendant

with mail fraud, in violation of Title 18, United States Code, Section 1341. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no earlier than in or about October 2011, and continuing until no earlier than in or about May 2018, in the Northern District of Illinois and elsewhere, defendant ROBERT DIMEO devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, which scheme is further described below.

Specifically, DIMEO, along with his co-schemers James Collins and Michael Walsh, fraudulently misappropriated at least about $5.3 million from Honor Finance, LLC by diverting to LHS Solutions money owing to Honor Finance, LLC. Honor Finance Corporation and Honor Finance, LLC were in the business of sub-prime automobile financing. Collins and DIMEO controlled and managed both of those entities. DIMEO and his co-schemers created and controlled LHS Solutions for the

purpose of carrying out this scheme in two ways. First, they caused LHS Solutions to purchase GPS devices from GPS Seller A and then resell those GPS devices to Honor Finance, LLC at a significant markup, with LHS Solutions keeping the markup. Second, they caused vehicle warranty issuers to send commission payments on Honor Finance, LLC's sale of vehicle warranties to LHS Solutions, rather than to Honor Finance, LLC. The defendants did not reveal to Private Equity Firm A and to others at Honor Finance, LLC that they had created and controlled LHS Solutions and were using it to misappropriate money from Private Equity Firm A and Honor Finance, LLC. DIMEO, Collins, and Walsh then used the money they misappropriated from Honor Finance, LLC and Private Equity Firm A to benefit themselves.

Prior to and including 2011, Collins and DIMEO controlled Honor Finance Corporation. Walsh had done some work for Honor Finance Corporation and was paid for his work. In about October 2011, Private Equity Firm A purchased certain assets of Honor Finance Corporation and created Honor Finance, LLC, an entity that Private Equity Firm A agreed Collins and DIMEO would manage. At around the time Honor Finance, LLC was created, Collins told Walsh that Private Equity Firm A and the newly formed Honor Finance, LLC no longer would need his services. But Collins planned to establish an entity that would serve as a middleman in Honor Finance, LLC's purchase of GPS devices from GPS Seller A, and that the new entity would mark up the prices of the GPS devices and resell them to Honor Finance, LLC.

3

Collins also planned for the new entity to handle vehicle warranty work on behalf of Honor Finance, LLC.    The new entity paid Walsh a salary.  At Collins' direction, Walsh incorporated LHS Solutions and DIMEO arranged to open a corporate bank account for LHS Solutions with Walsh as the sole authorized signer on the account.

DIMEO directed Walsh how to manage LHS Solutions, including details regarding how to purchase GPS devices from GPS Seller A and then mark them up and sell them to Honor Finance, LLC, as well as how to obtain and process commission payments from vehicle warranty providers.  Walsh was the only person on LHS Solutions' payroll, and LHS Solutions did no legitimate work as a distributor of GPS devices.  LHS Solutions' only function was to serve as a middleman between Honor Finance, LLC and GPS Seller A, and to collect and keep vehicle warranty commissions that rightfully belonged to Honor Finance, LLC.

<u>GPS Devices</u>

After LHS Solutions was incorporated, DIMEO directed GPS SELLER A to send invoices to LHS Solutions, rather than to Honor Finance, LLC.  DIMEO paid GPS Seller A invoices using his own personal credit cards.  DIMEO directed Walsh to take the invoices received from GPS Seller A and create corresponding LHS Solutions invoices to Honor Finance, LLC using a template DIMEO had supplied Walsh and including the same GPS serial numbers, quantities, prices and invoice numbers, but marking up the prices at which LHS Solutions would sell them to Honor Finance, LLC.  DIMEO provided Walsh with the specific directions on how to mark

4

up these GPS devices, and DIMEO told him to have the invoices addressed to DIMEO at Honor Finance, LLC. Honor Finance, LLC then paid LHS Solutions for the GPS devices. DIMEO caused LHS Solutions to pay his personal credit card bills so as to reimburse him for the GPS devices he had charged, and remaining money from the mark-up was used to personally benefit DIMEO and his co-schemers.

As a result of marking up and reselling to Honor Finance, LLC the GPS devices purchased from GPS Seller A, defendants misappropriated approximately $3.1 million.

### Vehicle Warranty Commissions

Honor Finance, LLC was entitled to receive commissions from certain vehicle warranty companies on the sale of warranties they issued to certain vehicle purchasers. DIMEO arranged with warranty companies that they would send commission payments to LHS Solutions, rather than to Honor Finance, LLC. DIMEO directed Walsh to sign certain documents, including IRS Forms W-9 and Direction of Pay Authorizations, directing that the warranty issuers pay LHS Solutions, rather than Honor Finance, LLC. DIMEO told Walsh that some of these vehicle warranty issuers would send commission payments to LHS Solutions. Upon receiving the warranty commission checks, DIMEO directed Walsh to cause the checks to be deposited into the LHS Solutions bank account, and the money was used to personally benefit DIMEO and his co-schemers.

As a result of causing the warranty commissions to be directed to LHS Solutions, rather than to Honor Finance, LLC, defendants misappropriated approximately $2.2 million.

<u>Disposition of the Misappropriated Funds</u>

The defendants used the misappropriated funds for their own benefit. Approximately $2.8 million was transferred from LHS Solutions' account to the account of Honor Capital—an entity established with Private Equity Firm A's consent for the purpose of collecting on loans and lines of credit that Private Equity Firm A had not purchased from Honor Capital Corporation, but for which Honor Capital Corporation was still responsible. But defendants knew Honor Finance, LLC's funds could not be used to pay down Honor Finance Corporation's debts, so they did not disclose to Private Equity Firm A and to others at Honor Finance, LLC that funds were misappropriated from Honor Finance, LLC and were used to pay down Honor Finance Corporation's debts.

Defendants also caused approximately $800,000 in funds that had been misappropriated from Honor Finance, LLC to be transferred from LHS Solutions' account to the accounts of 49 Salem Lane and BGB Management, LLC, entities that Collins and DIMEO owned and controlled. At DIMEO's direction, Walsh signed on behalf of LHS Solutions lease agreements between LHS Solutions and BGB Management for at least three properties, even though neither Walsh nor LHS Solutions lived in or used any of those properties.

Defendants also caused approximately $80,000 in funds that had been misappropriated from Honor Finance, LLC to be transferred from LHS Solutions to help purchase a lake house located in Dowagiac, Michigan. DIMEO directed Walsh to authorize the $80,000 payment because Collins had arranged to purchase the home from Collins' relative and because Collins wanted the money to come from LHS Solutions.

In total, defendants misappropriated at least about $5.3 million from Private Equity Firm A and Honor Finance, LLC.

On or about August 20, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant ROBERT DIMEO, for the purpose of executing the above-described scheme, did knowingly cause to be delivered to Evanston, Illinois, by FedEx, a commercial interstate carrier, 120 GPS devices sold by GPS Seller A to LHS Solutions, in violation of Title 18, United States Code, Section 1341.

7.     Defendant, for purposes of computing his sentence under Guideline § lBl.2, stipulates to having committed the following additional offense:

Between no later than approximately May 2015, and continuing until no earlier than in or about approximately May 2018, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant ROBERT DIMEO knowingly participated in a scheme to defraud a financial institution, and to obtain money and property from the financial institution by means of materially false and fraudulent pretenses, representations, and promises.

Specifically, ROBERT DIMEO was the Chief Operating Officer of Honor Finance, LLC, which was an Evanston, Illinois company that was engaged in the business of subprime automobile financing. In about May 2015, Honor Finance, LLC entered into a financing agreement with Financial Institution 1 referred to as a Warehouse Line. The Warehouse Line provided for a $200 million line of credit for Honor Finance, LLC's use in its lending operations. The Warehouse Line Agreement set forth eligibility requirements for loans made by Honor Finance, LLC that were to be funded by the Warehouse Line.

The Warehouse Line Agreement placed limits on the amount of funds Honor Finance, LLC could use at any one time. The funding limits were subject to an Advance Rate representing the percentage of money outstanding on the Warehouse Line in relation to the principal balance of Honor Finance, LLC's loan portfolio. The Advance Rate could change if certain triggers were met. For instance, if the delinquency ratio of the loans in the portfolio or the average extension ratio exceeded a certain figure, then the Advance Rate could change, which could have required that Honor Finance, LLC increase its collateral for the Warehouse Line or reduce the amount of funding it had outstanding on the Line.

Under the Warehouse Agreement, Honor Finance, LLC was required to submit monthly servicer reports to Financial Institution 1 that set forth data about Honor Finance, LLC's loan portfolio and the use of funds from the Warehouse Line. The monthly servicer reports included information relevant to the possible application of

8

triggers for the Advance Rate. The information contained in the monthly servicer reports was meant to enable Financial Institution 1 to evaluate the health of Honor Finance, LLC's loan portfolio, and, as a result, the risk to the Warehouse Line that Honor Finance, LLC was utilizing.

ROBERT DIMEO and James Collins, who was the Chief Executive Officer of Honor Finance, LLC, caused the monthly servicer reports submitted to Financial Institution 1 to be false by improperly utilizing bookkeeping techniques referred to as "Allowable Delinquencies" and "Honor Payments" to make Honor Finance, LLC's loan portfolio look healthier and more current than it was. An "Allowable Delinquency" was a mechanism whereby Honor Finance, LLC gave one of their subprime borrowers what essentially amounted to a 30-day extension on a loan payment. While granting extensions to borrowers was not in itself improper where the borrower was temporarily unable to make a payment due to a situation such as a job loss or health problem, Honor Finance, LLC frequently applied Allowable Delinquencies without any contact with the borrower. In other words, Honor Finance, LLC granted Allowable Delinquencies not knowing the reasons for the borrower's failure to pay and with little to no assurance that the allowable delinquency would make it more likely that the loan ultimately would not need to be charged off.

An "Honor Payment" was a code Honor Finance, LLC entered into its books to indicate that a borrower had made a payment (either full or partial) toward the

borrower's loan for a particular month when, in fact, the borrower had not made any or all of the payment. Honor Payments were a technique that Honor Finance, LLC used to falsely record in the books that a full payment had been made.

DIMEO and Collins caused the improper application of Allowable Delinquencies and Honor Payments in order to convince Financial Institution 1 that many more of its loans were less delinquent than they actually were in order to avoid charging off loans. Their actions resulted in the monthly servicer reports submitted to Financial Institution 1 being false. Specifically, for instance, the monthly servicer reports made it seem that many of the loans Honor Finance, LLC had made were not more than 30 days past due and were not subject to being charged off, when in fact they were. Honor Finance LLC's loan portfolio funded by the Warehouse Line was in a far different (and worse) condition than the false monthly servicer reports made it seem. The information provided to Financial Institution 1 in the monthly servicer reports was material to Financial Institution 1.

The practical effect of improperly using Allowable Delinquencies and Honor Payments was to avoid the application of triggers in the Warehouse Agreement that could have required Honor Finance, LLC to increase the amount of collateral it needed to post or to return or reduce the amount of funds it had drawn from the Warehouse Line. Either of those outcomes would have had a significant effect on Honor Finance, LLC's cash flow and its ability to fund its lending operations.

The poor conditions of the loan portfolio ultimately led to the default of many loans funded by the Warehouse Line and resulted in a loss of approximately $50,200,000 to Financial Institution 1.

In about December 2016, Financial Institution 1 and Honor Finance, LLC agreed to securitize thousands of subprime loans from Honor Finance LLC's loan portfolio to be sold as bonds. An entity known as Honor Automobile Trust Securitization 2016-1 ("HATS") was established as the entity for this purpose. Honor Finance, LLC was the Servicer of the Trust, and Financial Institution 1 underwrote the issuance of the bonds. An Offering Memorandum was issued in about December 2016, and an investor presentation was created and provided to potential investors.

More than 14,000 subprime loans from Honor Finance, LLC's portfolio were moved from Honor Finance, LLC's existing loan portfolio into HATS and packaged or securitized into bonds to be sold to the public. The bonds were funded by a stream of income from Honor Finance, LLC's loan portfolio, and the bonds were collateralized by that portfolio of loans. The Offering documents set forth the procedures by which various interested parties, including the different classes of bond holders and Honor Finance, LLC itself, would be paid from the HATS Trust. The offering documents provided that Honor Finance, LLC could receive money from the HATS Trust if certain conditions were met, including the payment of bond holders with higher priority and the satisfaction of an overcollateralization ratio that compared the HATS loan portfolio to the remaining balance of the bonds. Honor Finance, LLC provided

11

information about the portfolio of loans to certain ratings agencies that rated the bonds for the investing public.

The offering documents for the bonds set forth the eligibility requirements for loans to be included in the HATS portfolio. For instance, loans could not be placed into the HATS portfolio if they were more than 30 past due or if they had funds advanced to them by Honor or its affiliates to keep them from becoming more than 30 days past due. They also said that extensions would be granted only for temporary relief to borrowers and not more than once every 3 months for any particular loan. These requirements were meant to assure investors that the HATS portfolio contained only current and performing loans. The offering materials also set forth requirements for how Honor Finance, LLC would repossess vehicles where loans were in arrears, and they described when Honor Finance, LLC would charge off non-performing loans in the HATS portfolio.

As with the Warehouse Line, Honor Finance, LLC was required to prepare monthly reports that provided information about the status of loans in the HATS portfolio. These monthly reports, sometimes called "Servicer's Certificates," were submitted to Financial Institution 1, as well as to ratings agencies and the bond investors, to keep them informed about the status of the portfolio and the bonds backed by the portfolio. These monthly reports were material to Financial Institution 1, the ratings agencies, and the bond holders.

Despite the eligibility requirements for loans in the HATS portfolio, DIMEO and Collins caused many loans to be placed in the HATS portfolio that already were more than 30 days past due. Some loans already had been given more than one extension every 3 months. Many of those loans already had Honor Payments applied to them to make them seem current when they were not current, and they violated the eligibility requirement that funds not have been advanced to them to keep them from becoming more than 30 days past due.

After loans were moved into the HATS portfolio, DIMEO and Collins continued to cause Allowable Delinquencies and Honor Payments to be used to make many of the loans appear to be current or less delinquent than they actually were, as they had done with loans in the Warehouse Line. DIMEO and Collins kept many of these loans in the 30-day past due category—rather than the 60-day past due category—by their use of one or more improper applications of Allowable Delinquencies and/or Honor Payments. Most of these Allowable Delinquencies and Honor Payments were applied without any communication with, and without the knowledge of, the borrowers in question.

With respect to the Warehouse Line, the primary purpose of their fraudulent actions was to maintain the appearance of a more current loan portfolio and forestall having to charge off loans, because avoiding the triggers in the Warehouse Line Agreement meant Honor Finance, LLC could keep more cash from the Line. With respect to the HATS deal, the primary purpose of their fraudulent actions was to keep

the loans in the HATS loan portfolio from being charged off, because charging off loans affected the overcollateralization rate and, consequently, negatively affected Honor Finance, LLC's ability to receive money from the HATS Trust that it wanted in order to maintain and grow its business.

DIMEO and Collins also delayed the entry of vehicles into their books for repossession processes. The offering materials for the HATS deal governed when vehicles must be repossessed and charged off. However, DIMEO and Collins knew that delaying the entry into the books of the repossession process meant that the time for charging off the loans was delayed. When the time for charging off the loans was delayed, Honor Finance, LLC could continue to obtain and maintain cash from the Warehouse Line and the HATS Trust. To secure and keep more cash, DIMEO and Collins knowingly misrepresented the status of repossessed vehicles to Financial Institution 1, the ratings agencies, and bond holders, so Honor Finance, LLC could falsely show fewer accounts where charge-offs needed to be made.

The poor conditions of the HATS loan portfolio ultimately led to Financial Institution 1 having to write off approximately $4,300,000.

The cumulative loss to Financial Institution 1 from the fraud in connection with both the Warehouse Line and the HATS deal was approximately $54,500,000.

On or about June 9, 2017, in the Northern District of Illinois, Eastern Division, and elsewhere, ROBERT DIMEO knowingly executed the scheme to defraud by submitting and causing to be submitted to Financial Institution 1 a monthly

Servicer's Certificate that contained false information about the status of loans in the HATS Trust, in violation of Title 18, United States Code, Section 1344.

8.     The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

9.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.     A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court. The Court also may order restitution to any persons as agreed by the parties.

c.     Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

10.     Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

11.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

        a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2021 Guidelines Manual.

b. **Offense Level Calculations**.

<u>Offense of Conviction</u>

i.      The base offense level is 7, pursuant to Guideline § 2B1.1(a)(1).

ii.     The offense level is increased by 18 levels, pursuant to USSG § 2B1.1(b)(1)(J), because the actual loss amount was approximately $5,300,000, which is more than $3,500,000 but not more than $9,500,000.

iii.    The offense level is increased by 2 levels, pursuant to USSG § 2B1.1(b)(10)(C), because a substantial part of the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

iv.     The offense level for the offense of conviction is 27.

<u>Stipulated Offense</u>

v.      The base offense level is 7, pursuant to Guideline § 2B1.1(a)(1).

vi.     The offense level is increased by 22 levels, pursuant to USSG § 2B1.1(b)(1)(L), because the actual loss amount was approximately $54,500,000, which is more than $25,000,000 but not more than $65,000,000.

vii.    The offense level is increased by 2 levels, pursuant to USSG § 2B1.1(b)(10)(C), because a substantial part of the offense involved

17

sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

> viii.      The offense level for the stipulated offense is 31.

Grouping

> ix.      Pursuant to USSG § 3D1.2(d), the Offense of Conviction and the Stipulated Offense are grouped together into a single group.

> x.      Pursuant to USSG § 3D1.3(b), the offense level applicable to the Group is the offense level corresponding to the aggregated quantity, which is approximately $59,800,000, which corresponds to an increase in the offense level of 24 levels, as $59,800,000 is between $25,000, 000 and $65,000,000. When combined with the base level of 7 and the other applicable enhancements, the result is a combined offense level of 31.

Acceptance of Responsibility

> xi.      Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

18

xii.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.     **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.     **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 28 which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 78 to 97 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.     Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to

19

conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.      Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

**Cooperation**

12.     Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial

preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this agreement, then the government shall move the court, pursuant to Guideline § 5Kl.l, to depart downward from the low end of the applicable guideline range in an amount to be determined by the government at the time of sentencing. Defendant shall be free to recommend any sentence.

14. If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

15. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum

penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

16.     Regarding restitution, defendant acknowledges that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution to victims in an amount to be determined by the Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing. Defendant also agrees to pay additional restitution, arising from the stipulated offense conduct set forth above, in an amount to be determined by the Court at sentencing, pursuant to Title 18, United States Code, Sections 3663(a)(3) and 3664.

17.     Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

18.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

19.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code,

Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

20.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant.

## Forfeiture

21.     Defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense.

22.     Defendant agrees to forfeiture of the following specific property to the United States: The real property commonly known as 50001 W. Lakeshore Drive, Dowagiac, Michigan, 49047. In doing so, defendant admits that the property described above represents proceeds defendant obtained as a result of the offense, as alleged in the indictment. Defendant consents to the immediate entry of a preliminary order of forfeiture as to this specific property, thereby extinguishing any right, title, or interest defendant has in it. If any of the specific property is not yet in the custody of the United States, defendant agrees to seizure of that property so that it may be disposed of according to law.

23.     In addition, defendant agrees to the entry of a personal money judgment in the amount of $5,300,000, which represents the total amount of proceeds traceable

23

to the offense. Defendant consents to the immediate entry of a preliminary order of forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

24. Defendant admits that because the directly forfeitable property, other than the specific property noted above, is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of defendant, up to the value of the personal money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

25. Defendant understands that forfeiture shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

26. Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture carried out in accordance with this agreement on any grounds, including that the forfeiture

constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

27.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 20 CR 232.

28.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

29.     Defendant understands that nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from defendant and his spouse or defendant's partnership or corporations.

### Waiver of Rights

30.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.  **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.  The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.  If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.  If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering

26

each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

      v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

      vi.      At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

      vii.      At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

      viii.      With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

      b.      **Waiver of appellate and collateral rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code,

27

Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

31.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

**Presentence Investigation Report/Post-Sentence Supervision**

32.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

33.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

34.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the

disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

35.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

36.     Regarding matters relating to the Internal Revenue Service, defendant agrees as follows (nothing in this paragraph, however, precludes defendant and his spouse or defendant's partnerships or corporations from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS):

a.      Defendant agrees to cooperate with the Internal Revenue Service in any tax examination or audit of defendant and his spouse and defendant's partnerships or corporations which directly or indirectly relates to or arises out of the course of conduct that defendant has acknowledged in this Agreement, by

transmitting to the IRS original records or copies thereof, and any additional books and records that the IRS may request.

37.     Defendant will not object to a motion brought by the United States Attorney's Office for the entry of an order authorizing disclosure of documents, testimony and related investigative materials which may constitute grand jury material, preliminary to or in connection with any judicial proceeding, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i). In addition, defendant will not object to the government's solicitation of consent from third parties who provided records or other materials to the grand jury pursuant to grand jury subpoenas, to turn those materials over to the Civil Division of the United States Attorney's Office, or an appropriate federal or state agency (including but not limited to the Internal Revenue Service), for use in civil or administrative proceedings or investigations, rather than returning them to the third parties for later summons or subpoena in connection with a civil or administrative proceeding involving, or investigation of, defendant and his spouse or defendant's partnerships or corporations. Nothing in this paragraph or the preceding paragraph precludes defendant and his spouse or defendant's partnerships or corporations from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

38.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

39.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

40.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

41.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

42.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

43.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: ___8/11/22___

Signed by Jason Yonan on behalf of
JOHN R. LAUSCH, JR.
United States Attorney

ROBERT DIMEO
Defendant

MATTHEW GETTER
Assistant U.S. Attorney

WILLIAM ZIEGELMUELLER
Attorney for Defendant

33